**2015 UT App 88**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ARMANDO FLORES,
Defendant and Appellant.

Amended Opinion[1]
No. 20120438-CA
Filed April 16, 2015

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 101908899

Joanna E. Landau, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorney for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE STEPHEN L. ROTH and SENIOR JUDGE RUSSELL W. BENCH
concurred.[2]

VOROS, Judge:

¶1      Armando Flores served for five years as a leader of a West
Valley City church congregation. In 2012, he was convicted of

---

1. This Amended Opinion replaces the Opinion in Case No.
20120438-CA issued on September 11, 2014.

2. The Honorable Russell W. Bench, Senior Judge, sat by special
assignment as authorized by law. *See generally* Utah Code Jud.
Admin. R. 11-201(6).

sexual battery and unlawful detention for acts committed on a member of his congregation. Flores appeals his convictions, arguing that the trial court erred by prohibiting voir dire questions intended to uncover potential jurors' religious biases. Flores also argues that the State used its peremptory challenges improperly during voir dire, violating his rights under the Equal Protection Clause. We affirm.

BACKGROUND[3]

*Allegations of Sexual Abuse*

¶2     Armando Flores served as the branch president of a small LDS Church congregation in West Valley City.[4] In August 2009, Flores invited T.H., a sixteen-year-old member of his congregation who was also a family friend, to speak with him alone in his office. After their conversation, Flores grabbed her and "touched [her] breasts." At first T.H. did not tell anyone about the incident because she "didn't think anyone would believe [her]."

---

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations and internal quotation marks omitted).

4. A branch president oversees a small congregation of members of The Church of Jesus Christ of Latter-day Saints (the LDS Church). The LDS Church describes a branch president as "the presiding priesthood leader" in a branch. *See* The Church of Jesus Christ of Latter-day Saints, *Branch Guidebook*, at 4 (2001), *available at* https://www.lds.org/bc/content/shared/content/english/pdf/language-materials/31179_eng.pdf.

¶3     In December 2009, after a New Year's Eve party, Flores invited T.H. into a small, dark room at the church building where Flores's congregation met. Flores followed T.H. into the room, closed the door, and again touched her breasts. In addition, Flores gripped T.H.'s left arm with his right hand, and when he heard someone in the hall, he covered her mouth with his hand until the person passed. When Flores took his hand off T.H.'s mouth, she ran out of the room.

¶4     The State charged Flores with one count of forcible sexual abuse based on the August 2009 incident and a second count of forcible sexual abuse and one count of kidnapping based on the December 2009 incident. All are second-degree felonies.[5] At trial, the court also instructed the jury on the lesser included offenses of sexual battery, lewdness, and unlawful detention.[6]

---

5. A person commits forcible sexual abuse if that person
>      touches the breast of a female . . . with intent to cause substantial emotional or bodily pain to any person or with the intent to arouse or gratify the sexual desire of any person, without the consent of the other.

Utah Code Ann. § 76-5-404(1) (LexisNexis 2008).
>      A person commits kidnapping if that person intentionally or knowingly, without authority of law, and against the will of the victim . . . detains or restrains the victim for any substantial period of time . . . [or] detains or restrains a minor without the consent of the minor's parent or legal guardian or the consent of a person acting in loco parentis, if the minor is 14 years of age or older but younger than 18 years of age . . . .

*Id.* § 76-5-301.

6. A person commits sexual battery, a class A misdemeanor,
>      if the person under circumstances not amounting to [a more serious sex crime], intentionally touches,

                                                    (continued...)

*Voir Dire*

¶5 During jury voir dire, Flores requested that the trial court ask the prospective jurors about their religious affiliation. When the judge declined, defense counsel explained that jurors' religious affiliation may cause them to improperly weigh the testimony of certain witnesses:

> [T]he reason for that request is just due to the fact that a number of our witnesses are LDS, two of them are LDS clergy, the defendant himself was former LDS clergy. My request is based on finding out the affiliation of jurors so that we could gauge

---

(…continued)
> whether or not through clothing, . . . the breast of a female, and the actor's conduct is under circumstances the actor knows or should know will likely cause affront or alarm to the person touched.

Utah Code Ann. § 76-9-702(3) (LexisNexis Supp. 2009).

A person commits lewdness, a class B misdemeanor for most first-time offenders, when the person, under circumstances not amounting to a more serious sex crime,

> performs . . . under circumstances which the person should know will likely cause affront or alarm to, on, or in the presence of another who is 14 years of age or older . . . an act of sexual intercourse or sodomy . . . [or] any other act of lewdness.

*Id.* § 76-9-702(1), (2).

A person commits unlawful detention, a class B misdemeanor, if the person "intentionally or knowingly, without authority of law, and against the will of the victim, detains or restrains the victim" under circumstances not amounting to a more serious kidnapping crime. *Id.* § 76-5-304(1), (3) (LexisNexis 2008).

whether they would be impacted by the testimony, have any prejudices or preconceived notions based on that fact.

Though the trial court refused to ask prospective jurors about their religious affiliations, it did ask a question designed to test their ability to properly weigh testimony by religious leaders:

[Y]ou need to judge the credibility of a clergy member or religious leader the same way that you would judge any other witness regardless of that person's position in the community. The question is, do any of you feel that you would be unable to follow that direction . . . and not be able to sit as a fair and impartial juror in this case?

No prospective jurors indicated that they would be unable to properly judge the credibility of a church leader serving as a witness.

*Peremptory Strikes*

¶6     The State used all four of its peremptory strikes against male potential jurors. Flores challenged the State's strikes under *Batson v. Kentucky*, arguing that the State's use of peremptory strikes violated the Equal Protection Clause. *See* 476 U.S. 79 (1986). The trial court invited the prosecutor to "articulate on the record [her] reasons" for each of her four strikes. The prosecutor explained that she struck the first potential juror because she feared his participation would create a basis for appeal, the second potential juror because of his age and lack of "life experience," the third potential juror because of a "domestic violence history," and the fourth potential juror because he seemed "offput" by the case.

¶7     Flores conceded that the State articulated a viable reason for excluding the first potential juror, but he argued that the State's justifications for the other strikes did not constitute satisfactory nondiscriminatory explanations. However, the trial

court found that the State had "articulated [a] legitimate basis for the reasons for [its] strikes" and thus denied Flores's *Batson* challenge. The jury consisted of five men and three women.

¶8      At trial, both parties called witnesses who were members of the LDS Church. T.H.'s parents, both LDS, testified for the prosecution. Flores's witnesses included the stake president who oversaw Flores's service as branch president, the branch president who replaced Flores, a young-women's leader from his branch, and Flores himself.

¶9      The jury acquitted Flores of the charged felonies, each of which carried a prison term of one-to-fifteen years. Instead, the jury convicted him of two lesser included misdemeanors: one count of forcible sexual abuse and one count of unlawful detention, carrying jail terms of zero-to-one year and zero-to-six months, respectively.

ISSUES ON APPEAL

¶10     Flores first contends that the trial court erred by preventing him from questioning the jurors at voir dire about their religious beliefs.

¶11     Second, Flores contends that the trial court erred in denying his *Batson* challenge.

¶12     Finally, Flores contends that, taken together, the voir dire restrictions and *Batson* determination constitute cumulative error, undermining confidence in the verdict.

ANALYSIS

I. Voir Dire

¶13     Flores contends that "the trial court abused its discretion in restricting voir dire on LDS religious affiliation and related

bias." The jurors' "religion was relevant," Flores argues, because Flores was a former LDS branch president, the victim was a former member of his branch, seven of the ten trial witnesses testified to their LDS religious affiliation, and all of the alleged acts transpired in an LDS Church building. In response, the State argues that "religion was not particularly relevant in this case" and that, "even if it were, it would not have created bias in favor of one side over the other."[7]

¶14    The Utah Constitution guarantees that no person "shall . . . be incompetent as a . . . juror on account of religious belief or the absence thereof." Utah Const. art. I, § 4; *see also* Utah Code Ann. § 78B-1-103(2) (LexisNexis 2008) ("A qualified citizen may not be excluded from jury service on account of . . . religion . . . ."). But juror competence and juror bias are separate considerations. Therefore, while "it is ordinarily inappropriate to inquire into venire members' religious beliefs during voir dire," inquiries into religion may be appropriate when the case presents "the possibility of actual bias stemming from religious beliefs." *Depew v. Sullivan*, 2003 UT App 152, ¶ 13, 71 P.3d 601; *see also, e.g.*, *State v. Ball*, 685 P.2d 1055, 1060 (Utah 1984) (holding that asking a potential juror whether "his abstention from the drinking of alcohol has a religious basis is not prohibited by the Utah constitution").

¶15    Voir dire examination serves two purposes: "the detection of actual bias . . . and the collection of data to permit informed exercise of the peremptory challenge." *State v. Piansiaksone*, 954 P.2d 861, 867 (Utah 1998) (citation and internal quotation marks omitted). "[T]he obligation to impanel an impartial jury lies in the first instance" with trial judges, who "must rely largely" on their "immediate perceptions." *Rosales-Lopez v. United States*, 451

---

7. Flores also contends that if we reject this claim as unpreserved, his trial counsel was ineffective for failing to preserve it. Because we address the claim on its merits, we need not address the alternative ineffectiveness claim.

U.S. 182, 189 (1981). Appellate courts therefore typically accord trial courts "ample discretion in determining how best to conduct" voir dire. *Id.*; *see also Taylor v. State*, 2007 UT 12, ¶ 70, 156 P.3d 739. "[T]rial judges are not compelled to permit *every* question that . . . might disclose some basis for counsel to favor or disfavor seating a particular juror." *Piansiaksone*, 954 P.2d at 868. But "trial courts should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit information from prospective jurors." *Id.*

¶16    The nature of the voir dire questioning determines the scope of the trial court's discretion. "That discretion is strictly limited where the questions are directly related to bias and prejudice, but increases as the directness of that relation decreases or, in some instances, where the question unduly intrudes upon the privacy of the jurors." *Id.* Thus, questions that "directly search for questionable attitudes among jurors deserve more favorable treatment by trial courts." *Piansiaksone*, 954 P.2d at 868. Moreover, a trial court's "failure to ask questions in a particular manner" does not constitute error as long as the trial court's substitute questions covered "the relevant subject area of potential bias." *Id.* at 867.

¶17    Here, Flores urged the trial court to ask the jurors to state "their individual religious affiliation." Defense counsel explained,

> "[A] number of our witnesses are LDS, two of them are LDS clergy, [and] the defendant himself was former LDS clergy. My request is based on finding out the affiliation of jurors so that we could gauge whether they would be impacted by the testimony, have any prejudices or preconceived notions based on that fact."

The trial court denied this request and instead asked the entire panel a question targeting impartiality: whether the panel members could "judge the credibility of a clergy member or

religious leader the same way that [they] would judge any other witness."

¶18    We conclude that the question requested by defense counsel was "not phrased in a manner calculated to uncover potential bias pertinent to the facts of this case." *State v. Burke*, 2011 UT App 168, ¶ 74, 256 P.3d 1102. It was, rather, one that would "require multiple inferential steps or follow-up questions to elucidate real or possible bias." *Piansiaksone*, 954 P.2d at 868. While the proposed question "may have eventually led to indications" of religious bias, it "would have required several additional questions or inferences before reaching even an indication of latent bias." *Id.*

¶19    We understand that the events of this case took place within a church context. Many of the trial witnesses were members or leaders of the LDS Church. Flores and the victim met because they were members of the same LDS branch. Both sides planned to call LDS Church members as witnesses—in fact, the defense called three LDS Church leaders (in addition to Flores himself) as witnesses. On these facts, the religious affiliation of a juror without more does not indicate bias. As the State argues, "[e]ven assuming that a juror who belonged to the LDS Church might favor her fellow members, knowing that the juror was LDS would not have indicated whether that juror would be more likely to favor the prosecution's LDS witnesses or the defense's."

¶20    Flores argues that "if a juror was agnostic or atheist, Flores might have followed up about bias against organized religion that might make the juror discredit the testimony of clergy or religious witnesses." But this argument reveals that the requested voir dire question was one that would "require multiple inferential steps or follow-up questions to elucidate real or possible bias." *State v. Piansiaksone*, 954 P.2d 861, 868 (Utah 1998).

¶21    As noted above, a trial court's discretion "increases as the directness of [the relationship between the question and bias]

decreases or, in some instances, where the question unduly intrudes upon the privacy of the jurors." *Id.* Here, the proposed question was not directly related to bias and had some potential to intrude upon the privacy of the potential jurors. Moreover, while declining to ask each panel member's religious affiliation, the trial court did ask a general question targeting their attitudes toward clergy. Accordingly, we hold that the trial court did not exceed its discretion in refusing to ask the proposed question.

## II. *Batson* Challenge

¶22    Flores next contends that the trial court erred in denying his *Batson* challenge, because the State's peremptory strikes were motivated by purposeful gender-based discrimination. In response, the State contends that Flores "has not shown that the prosecutor's explanations for her strikes were gender-based."

¶23    "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). Discriminatory selection procedures "undermine public confidence in the fairness of our system of justice" and act as "a stimulant" to prejudices that impede the "equal justice which the law aims to secure." *Id.* at 87–88 (citation and internal quotation marks omitted). *Batson* itself applied only to race-based discrimination in criminal trials. But in 1991 the United States Supreme Court extended its reach to civil proceedings, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991), and in 1994 the Court extended *Batson* to gender-based discrimination, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128–29 (1994).

¶24    *Batson* aims to produce "actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson v. California*, 545 U.S. 162, 172 (2005). In pursuit of those answers, a defendant may rely on the prosecutor's exercise of peremptory challenges against members of the protected groups to support a claim of purposeful discrimination. *Batson*, 476 U.S. at 96. To test a defendant's *Batson* claim, the trial court must oversee a three-stage process.

In the first stage, "a defendant must make a prima facie showing that a peremptory challenge has been exercised" on an impermissible basis, such as race or gender. *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003). The "pattern of strikes" might be enough to make this prima facie showing, as might "a prosecutor's comments and statements." *United States v. Johnson*, No. 12-3229, 2014 WL 2854996, at *3 (7th Cir. June 24, 2014).

¶25 In the second stage, the prosecution must offer a legitimate—in this case gender-neutral—basis for striking the juror in question. *See Cockrell*, 537 U.S. at 328. "[T]he prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising [the] challenges." *Batson*, 476 U.S. at 98 n.20 (citation and internal quotation marks omitted). But while a "*Batson* challenge does not call for a mere exercise in thinking up any rational basis," *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005), the prosecutor's gender-neutral explanation need not be "persuasive, or even plausible," *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

¶26 In the third stage, "the trial court must determine whether the defendant has shown purposeful discrimination." *Cockrell*, 537 U.S. at 328–29. To do so, the trial court assesses whether the contested strikes were "motivated in substantial part by discriminatory intent." *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. While the third stage requires the trial court to evaluate the credibility of the prosecutor's justification, "the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." *Id.*

¶27 Though the justifications provided in *Batson*'s second stage inform the trial court's determination in the third, the two stages must be kept distinct. The prosecutor's ability to articulate a neutral basis for a peremptory challenge does not guarantee third-stage vindication. "When there is reason to believe that there is a racial motivation for [a] challenge, neither the trial

courts nor [the appellate courts] are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Johnson v. Vasquez*, 3 F.3d 1327, 1331 (9th Cir. 1993). Conversely, the prosecutor's inability to articulate a logical basis for a peremptory challenge does not doom the prosecutor to a finding of purposeful discrimination. As the Ninth Circuit Court of Appeals explained, "[A prosecutor's] reasons may not be logical, but that's what peremptory challenges are all about. They are often founded on nothing more than a trial lawyer's instinct about a prospective juror." *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987). So although "it can sometimes be hard to say what the reason [for exercising a peremptory challenge] is," once a defendant alleges purposeful discrimination, prosecutors must "simply . . . state [those] reasons as best [they] can and stand or fall on the plausibility of the reasons [given]." *Dretke*, 545 U.S. at 252.

¶28    Proving purposeful discrimination under *Batson* presents a formidable enough task in the trial court. But once a trial court has stamped its approval on a prosecutor's peremptory challenges, mounting a successful *Batson* challenge on appeal verges on the impossible.[8] The reason lies in the standard of

---

8. The United States Supreme Court "consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005). But the Court has also recognized "the practical difficulty of ferreting out discrimination in selections discretionary by nature." *Id.*

   *Batson*'s critics bemoan the toothlessness of the system the Court has devised to combat discrimination in jury selection. One observed that our "current framework makes it exceedingly difficult for judges to reject even the most spurious of peremptory strikes." Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L. Rev. 1075, 1077 (2011). Another noted that *Purkett v. Elem* allows

(continued...)

review: a trial court's *Batson* determination rests on factual findings that "largely . . . turn on evaluation of credibility," and we give those findings "great deference." *Batson*, 476 U.S. at 98 n.21. Accordingly, we will not set aside a trial court's determination regarding discrimination during jury selection absent clear error. *State v. Higginbotham*, 917 P.2d 545, 548 (Utah 1996).

¶29    The prosecutor here used her four peremptory strikes to remove four men from the jury pool. For the purposes of this opinion, we refer to them as Jurors 1, 2, 3, and 4. Because the "exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system," we examine each strike individually. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994).

A.    Waiver of Challenge to Juror 1

¶30    Flores waived his *Batson* challenge to Juror 1 below. Before his *Batson* challenge, Flores had moved unsuccessfully to exclude Juror 1 for cause. The prosecutor struck Juror 1 to foreclose an appellate challenge: "If it turns out defense counsel is forced to use a peremptory strike to excuse someone who . . . should have been excused for cause, that's a basis for an appeal." Defense counsel responded, "I understand that there's a rationale for [the prosecutor's striking Juror 1]."

¶31    Failure to pursue a *Batson* objection after opposing counsel has "offered a legitimate, nondiscriminatory explanation" waives the *Batson* challenge to the strike in

_____

(…continued)
prosecutors to "offer any reason at all" for exercising a peremptory strike, "no matter how 'silly or superstitious'—as long as it is race neutral." Nancy S. Marder, Batson *Revisited*, 97 Iowa L. Rev. 1585, 1593 (2012) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

question. *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027–28 (4th Cir. 1998); *accord Hopson v. Fredricksen*, 961 F.2d 1374, 1376–77 (8th Cir. 1992); *United States v. Rudas*, 905 F.2d 38, 39 (2d Cir. 1990). That happened here. We therefore conclude that Flores waived his *Batson* challenge to the prosecution's strike of Juror 1.

B.      The Three Remaining Strikes

¶32    After guiding the parties through the first two *Batson* stages, the trial court found that the State had "articulated [a] legitimate basis for the reasons for their strikes," then denied Flores's *Batson* challenge. The trial court implied the intermediary steps: that Flores failed to demonstrate a discriminatory motive and thus failed to carry his "ultimate burden of persuasion." *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). We ask only whether the trial court clearly erred by finding that Flores failed to demonstrate a discriminatory motive for any of the three remaining strikes. *Higginbotham*, 917 P.2d at 548.

1.      Juror 2

¶33    The prosecutor struck Juror 2 as young and inexperienced. She explained that other jurors had "had more extensive involvement in family and career." Juror 2, by comparison, seemed to be "someone who wouldn't bring a lot of experience." Flores argued during jury selection and again on appeal that Utah Code section 78B-1-103(2) prohibits excluding citizens from jury service on account of age. Flores also argues that "the prosecutor proffered no explanation why youth or inexperience in family or career were relevant to this case."

¶34    Both arguments fail. Utah Code section 78B-1-103 prohibits excluding qualified citizens from jury service based on age. But it does not guarantee that a qualified panel member will survive voir dire, which subjects each potential juror to strikes for cause and peremptory strikes. And though *Batson* forbids parties from basing peremptory strikes on race or gender, it

offers potential jurors no protection from peremptory strikes based on age.

¶35    Further, despite defense protestations, the prosecutor was not obliged to explain "why youth or inexperience in family or career were relevant to this case." Though *Batson*'s second step requires prosecutors to provide a "legitimate reason" for each challenged strike, "[w]hat [*Batson*] means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769. Even if we agreed that striking Juror 2 based on his age and experience "made no sense," the prosecutor's reason qualified as legitimate because it did not deny equal protection. The trial court considered Flores's evidence of discrimination and the State's proffered explanation, then found the State's motives legitimate. That finding does not constitute clear error. We therefore affirm the trial court's decision with respect to the prosecution's strike of Juror 2.

2.    Juror 3

¶36    The prosecutor struck Juror 3 because "he was involved in a protective order hearing a couple of years ago" and a "domestic violence history" was not part of "the makeup" she sought in potential jurors. During jury selection, Flores argued that the prosecutor's reason for striking Juror 3 was pretextual. On appeal, Flores argues that under *State v. Jensen*, peremptory strikes based on a potential juror's past involvement with protective orders are gender-based and thus discriminatory. *See* 2003 UT App 273, 76 P.3d 188.

¶37    During voir dire, the trial court asked the potential jurors if they had "ever been called to testify as a witness in a civil or criminal case." Juror 3 raised his hand and stated that he had been called as a witness in a civil protective-order case several years before.

¶38    Though the mention of a protective order during voir dire superficially links the present case to *Jensen*, *Jensen* differs from this case in a critical way. In *Jensen*, the prosecutor struck three

men from the venire. *Id.* ¶ 2. During voir dire, each man had mentioned past involvement with protective-order cases. *Id.* The prosecutor referred to that involvement in explaining her decision to strike the men. *Id.* She continued, "[L]ogically I assumed that usually [men involved in protective-order cases] would be on defendant's side," because men were "more than likely" the respondents in protective-order cases. *Id.* The trial court found the prosecutor's explanation gender-neutral and denied Jensen's *Batson* challenge. *Id.* But this court reversed, concluding "as a matter of law that the prosecution did not provide a gender-neutral explanation for the two strikes in question." *Id.* ¶ 15. We emphasized that the prosecutor's explanation relied on a gender stereotype: men are more likely than women to be respondents in protective-order cases because, presumably, men are more prone to commit domestic violence. *Id.* ¶ 16. We concluded that "any use of gender in the jury selection process" violates the equal protection clause. *Id.* ¶¶ 16–17.

¶39   Though the prosecutor here explained that she sought to exclude jurors who had been "involved in a protective-order hearing," she did not link involvement with protective-order cases to Juror 3's gender. During voir dire, Juror 3 stated only that he had served as a witness in a protective-order case. Unlike the prosecutor in *Jensen*, the prosecutor here expressed no further assumptions about Juror 3's role in the protective-order case based on his gender.

¶40   The relationship between a juror's involvement in a protective-order hearing and the issues in this case remains unclear: as the prosecutor acknowledged, "domestic violence would not have been [at issue] in this case." But as we explained above, *Batson*'s second step does not require a reason that makes sense. It requires only "a reason that does not deny equal protection." *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam). Unlike the prosecutor in *Jensen*, the prosecutor here did not link protective orders and gender. Her reason thus did not deny Juror 3 equal protection of the law. The trial court therefore did not clearly err by finding the State's reasoning legitimate.

Accordingly, we affirm the trial court's decision with respect to the prosecution's strike of Juror 3.[9]

3.      Juror 4

¶41    The prosecutor struck Juror 4 because she felt "there was something unsettling for him about being" a juror in Flores's case. She acknowledged that she did not know "if it was the particular subject matter" that appeared to trouble Juror 4 "or just being [in court] as a juror altogether." The prosecutor seemed to base her concerns on Juror 4's expressions or demeanor: "I have been watching the faces of the jurors during jury selection and I don't pretend to be able to accurately read faces but just the expression that I've seen on him, I was concerned about his level of—felt that he was somewhat offput by the case." After Flores argued that her rationale "could be said in every single case with respect to every single juror," the prosecutor countered, "This is jury selection. We have peremptories for a reason and sometimes I do get to just react on my gut level to a potential juror."

¶42    Flores may well be correct about the prosecutor's explanation for striking Juror 4—the explanation could feasibly be used "in every single case with respect to every single juror." But that objection runs to *Batson*, not to the trial court's ruling here. And despite the fears Flores expresses, we disagree that "there would never be a remedy under *Batson*" if a fungible

---

9. Flores further argues that the prosecutor's reason for striking Juror 3 was pretextual, as evidenced by the prosecutor's failure to strike a female juror "with actual domestic violence experience." But the trial court was in the best position to gauge whether the reason was pretextual, and the court found no pretext. We defer to that judgment unless the pretext is clear. *State v. Higginbotham*, 917 P.2d 545, 548 (Utah 1996). That the prosecutor failed to strike a female juror who shared this one characteristic does not make the pretext clear.

subjective explanation allows the prosecutor to pass through *Batson*'s second stage.

¶43    In practice, a prosecutor's vague explanation will in some cases overcome a *Batson* challenge. In other cases, it will not. The outcome depends on whether the evidence provided by the *Batson* challenger in stage one, weighed in context against the prosecutor's explanation in stage two, convinces the trial court that the prosecutor's strikes were based on purposeful discrimination. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008). Unless the prosecutor expressly acknowledges basing her strike on race or gender, no stage-two rationale necessarily dooms the prosecutor to stage-three defeat. As the United States Supreme Court explained in *Miller-El v. Dretke*, "peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason [for exercising a peremptory] is." 545 U.S. 231, 252 (2005). If a prosecutor chooses to base a peremptory challenge on subjective factors, she will "stand or fall on the plausibility of the reasons" given. *Id.*

¶44    Because trial courts view "strikes made solely on 'gut instinct' or the demeanor of a juror . . . more suspiciously," those courts are more likely to reject such a vague explanation for a strike. *See State v. Rosa-Re*, 2008 UT App 472, ¶ 8 n.3, 200 P.3d 670. But the task of gauging the plausibility of a prosecutor's explanation falls primarily on the trial court. Appellate courts may on occasion conclude as a matter of law that a prosecutor did not provide a gender-neutral explanation in the second *Batson* stage. *See State v. Jensen*, 2003 UT App 273, ¶ 15, 76 P.3d 188. Or appellate courts may conclude that the proffered nondiscriminatory reasons for a strike "are so far at odds with the evidence that pretext is the fair conclusion." *See Dretke*, 545 U.S. at 234. But because a *Batson* determination turns largely on the evaluation of credibility, we accord the trial court's *Batson* findings "great deference." *Batson v. Kentucky*, 476 U.S. 79, 98 n.21 (1986).

¶45    Here, though the prosecutor relied in part on her gut reaction to justify striking Juror 4, her rationale did not deny

Juror 4 equal protection and is not "so far at odds with the evidence that pretext is the fair conclusion." *See Dretke*, 545 U.S. at 234. We therefore defer to the trial court's assessment of the prosecutor's credibility and its conclusion that Flores failed to meet his "ultimate burden of persuasion regarding [discriminatory] motivation." *See Purkett*, 514 U.S. at 768. We thus affirm the trial court's decision with respect to the prosecution's strike of Juror 4.

### III. Cumulative Error

¶46 Finally, Flores contends that the trial court's alleged errors during jury selection undermine confidence in the verdict and thus constitute cumulative error. We will reverse under the cumulative-error doctrine only if the cumulative effect of several errors undermines our confidence that a fair trial was had. *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). But the cumulative-error doctrine cannot be applied here. Flores "has failed to show that any of the trial court's actions amount to error," much less that the cumulative effect of any errors should undermine our confidence in the verdict. *See State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17.

### CONCLUSION

¶47 The trial court's decision to limit Flores's religious-affiliation voir dire questioning does not constitute an abuse of discretion. And the trial court did not clearly err in denying the *Batson* challenge. We therefore affirm.

### ON PETITION FOR REHEARING

¶48 After issuance of our opinion in this case, Flores filed a petition for rehearing raising two issues. We deny the petition for rehearing for reasons explained below.

¶49     First, the Petition for Rehearing asserts that our opinion impermissibly relies on "semantics." We do not believe it does. We can only review the trial court's refusal to ask the question Flores requested. And although the trial court invited Flores to "be more detailed about the specific question," Flores repeated that he wanted the trial court to ask prospective jurors' "religious affiliation." The trial court declined to ask the question, perhaps because the question seemed to approach the prohibition contained in article I, section 4 of our constitution, or perhaps because defense counsel himself stated that a Utah statute "does prohibit strikes based on religious affiliation." *See* Utah Code Ann. § 78B-1-103(2) (LexisNexis 2008) ("A qualified citizen may not be excluded from jury service on account of . . . religion . . . .").

¶50     In any event, the trial court explored Flores's expressed concern—one shared by the prosecution—that jurors might give more or less weight to the testimony of LDS clergy members:

> Also, there will be, it's anticipated that there are going to be members of religious organizations or clergy, religious leaders who are testifying at this trial. I previously have given you an instruction that you should judge the credibility of witnesses of law enforcement the same way that you would weigh the testimony of any other witnesses regardless of their job or position in the community. The same question applies with respect to clergy or other religious leaders. Do you need—you need to judge the credibility of a clergy member or religious leader the same way that you would judge any other witness regardless that person's position in the community. The question is, do any of you feel that you would be unable to follow that direction as it relates to religious leaders or clergy and not be able to sit as a fair and impartial juror in this case? If so, please raise your hand.

We do not agree that the trial court's inquiry amounted to nothing more than the "stark little exercise" condemned in *State v. Saunders*, 1999 UT 59, ¶ 34, 992 P.2d 951.[10] Flores contends that in not asking prospective jurors their religious affiliation the trial court abused its discretion. "An abuse of discretion occurs if the . . . court's actions are inherently unfair or if we conclude that no reasonable [person] would take the view adopted by the . . . court." *State v. Arguelles*, 2003 UT 1, ¶ 101, 63 P.3d 731 (alteration in original) (citations and internal quotation marks omitted). Under this standard, and on the record before us, we cannot agree that the trial court abused its discretion.

¶51 The Petition for Rehearing also takes issue with our statement that "mounting a successful *Batson* challenge on appeal verges on the impossible." *Supra* ¶ 28. Flores does not contend that the opinion misstates the principles to be applied in a *Batson* case in Utah, nor does it. Nor does our characterization suggest that appellate *Batson* challenges never succeed. Obviously, they sometimes do. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005); *State v. Valdez*, 2004 UT App 214, ¶ 30, 95 P.3d 291, *rev'd on other grounds*, 2006 UT 39, 140 P.3d 1219. Finally, to the extent Flores seeks to distinguish Utah law from federal law on this question, we see no basis for the distinction here. Flores's appeal alleges a *Batson* violation, not a violation of the Utah Constitution separate from *Batson*, *J.E.B.*, and their progeny. No state constitutional claim was before us on this appeal. *See State v. Worwood*, 2007 UT 47, ¶ 19, 164 P.3d 397.

¶52 The petition for rehearing is accordingly denied.

_____

10. "Although the lead opinion in *State v. Saunders*, 1999 UT 59, 992 P.2d 951, is a plurality opinion, a reading of all the justices' opinions in that case reveals that we cite herein only to portions of the lead opinion that enjoyed majority support." *Depew v. Sullivan*, 2003 UT App 152, ¶ 11 n.3, 71 P.3d 601.