**2016 UT App 207**

## THE UTAH COURT OF APPEALS

TODD W. MULDER,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140642-CA
Filed October 6, 2016

Fifth District Court, St. George Department
The Honorable G. Rand Beacham
No. 100502932

Todd W. Mulder, Appellant Pro Se

Sean D. Reyes and Ryan D. Tenney, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGE KATE A. TOOMEY and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

CHRISTIANSEN, Judge:

¶1 Todd W. Mulder appeals the district court's entry of
summary judgment in favor of the State on his claims for
postconviction relief. We affirm.

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

BACKGROUND

¶2    In 2003, Mulder and an acquaintance from prison, Campbell, decided to rob the victim's (Victim) coin shop at the suggestion of Mulder's girlfriend, Schlegel. Schlegel and Mulder had previously been to Victim's shop, where Schlegel noticed that Victim had retrieved cash from a safe behind his counter and that he had left the safe unlocked afterward. Schlegel brought up the idea of robbing Victim's coin shop, telling Mulder and Campbell that Victim was "sitting on a gold mine." Campbell suggested that Mulder help him rob the coin shop. However, after Mulder and Schlegel observed that Victim would recognize Mulder because he had visited the shop before, they agreed that Campbell would rob the shop alone and that Mulder would act as the getaway driver.

¶3    Mulder and Campbell obtained a wig and coat for Campbell to wear as a disguise, walkie-talkies for communication, and duct tape and handcuffs to restrain Victim. Campbell wanted to carry a stun gun, but Mulder insisted that Campbell instead use a gun that Mulder had recently obtained. Mulder instructed Campbell to "be a lion" when he went inside Victim's shop and to "go in and be forceful, take control of the situation immediately."

¶4    On November 24, 2003, Mulder, Campbell, and Schlegel drove to Mesquite, Nevada, in Schlegel's truck and checked into a hotel under Schlegel's name. The next morning, Campbell donned his disguise, and Mulder and Campbell then drove to Victim's coin shop in St. George, Utah. Mulder dropped Campbell off a short distance from Victim's shop.

¶5    Campbell entered Victim's shop, "pointed the gun and started . . . yelling and screaming." Victim was on the phone at the time and looked at Campbell "kind of funny." Campbell shot Victim in the chest. To ensure that Victim could not interfere

with the robbery, Campbell turned Victim onto his stomach and handcuffed his hands behind his back. As expected, Victim's safe was unlocked. Campbell loaded two duffel bags full of coins and money, radioed Mulder that he was ready to be picked up, and left the shop. When Campbell got inside the truck, he told Mulder that he had shot Victim in the shoulder and not to call 911. Victim died a short time later.

¶6 Mulder and Campbell drove back to the hotel and divided the stolen coins and money. As part of their share, Mulder and Schlegel received two one-ounce gold coins and "lots of silver coins." About two weeks later, Mulder and Schlegel went to a pawn shop in Las Vegas, Nevada, to sell one of the gold coins. Campbell unexpectedly approached them in the parking lot and told them that he had sold a gold coin at the same pawn shop earlier that day. Mulder was concerned that "Campbell [was] throwing the money around" and that he would attract unwanted attention, so Mulder offered Campbell $3,000 for the coins that Campbell still had from the robbery. Mulder told Campbell to "[t]ake the $3,000 and get out of here. We don't want to ever know who you are, we don't want to see you again." In the months following the crime, both Campbell and Mulder were reincarcerated for different offenses, but neither man had been linked to Victim's murder. Then, in October 2004, police officers received a tip that Campbell had confessed his involvement in the crime to a fellow inmate and that Campbell had implicated a former cellmate named "Todd" and Todd's girlfriend. Following up on this lead, officers were ultimately led to Mulder, Campbell, and Schlegel. In their interviews with police, both Campbell and Schlegel admitted their involvement in the crime and both claimed that Mulder was involved in the planning and execution of the crime. Mulder denied any involvement in the crime.

¶7 Mulder was charged with murder, aggravated robbery, and aggravated kidnapping. At his trial, both Schlegel and

Campbell testified and implicated Mulder in the crime. The State also introduced a video of the shooting taken from the coin shop's security camera, which showed Campbell approaching the shop's door after the shooting and motioning to someone outside. In addition, the State presented a receipt demonstrating that Mulder had sold a gold coin at a Las Vegas pawn shop shortly after the crime.

¶8    Mulder agreed to a stipulated set of facts for his trial, wherein he acknowledged his prior relationship with Campbell from their time together in prison and Campbell's role in the robbery and shooting. Mulder also testified on his own behalf, stating that he had been in Victim's coin shop several times with Schlegel and that he had heard Schlegel refer to the coin shop as a "gold mine." He also testified that he met up with Campbell a few weeks before the crime and that he was with Schlegel and Campbell when the idea of robbing the shop first came up. Mulder claimed that it was Schlegel's idea to rob the shop and that she had blackmailed him into participating in the planning of the crime. Mulder further acknowledged that he helped Campbell obtain a disguise and that he watched Campbell don the disguise on the morning of the crime; however, he claimed that he only did so because of Schlegel's threats of blackmail. Mulder claimed that on the morning of the crime, he stayed in Mesquite and tried to sell stolen jewelry.

¶9    The jury convicted Mulder on all counts. Mulder, represented by new counsel, raised two claims of ineffective assistance of counsel on direct appeal: (1) that trial counsel failed to argue that the aggravated kidnapping charge merged into the crime of aggravated robbery, and (2) that trial counsel failed to move to dismiss the aggravated kidnapping charge on grounds of insufficient evidence. *State v. Mulder*, 2009 UT App 318U, para. 1. This court rejected both claims and affirmed Mulder's convictions. *Id.* paras. 2, 6, 10.

¶10 On August 25, 2010, Mulder filed a petition for postconviction relief under Utah's Post-Conviction Remedies Act (the PCRA). *See* Utah Code Ann. §§ 78B-9-101 to -405 (LexisNexis 2012). In the petition, Mulder argued that both his trial counsel and his appellate counsel had been ineffective. In addition, Mulder alleged that he was entitled to relief based on newly discovered evidence. In support of his newly discovered evidence claim, Mulder proffered two affidavits from Campbell, in which Campbell recanted portions of his trial testimony.

¶11 The district court directed the State to respond only to Mulder's ineffective assistance of appellate counsel and newly discovered evidence claims. The State then moved for summary judgment on all of Mulder's claims, and the district court granted the State's motion. Mulder now appeals the district court's grant of summary judgment to the State.

ISSUES AND STANDARD OF REVIEW

¶12 Mulder contends that the district court erred by granting the State's motion for summary judgment on his newly discovered evidence claim and on six of his ineffective assistance of appellate counsel claims. "We . . . review the postconviction court's grant of summary judgment for correctness." *Honie v. State*, 2014 UT 19, ¶ 28, 342 P.3d 182. "We affirm a grant of summary judgment when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Ross v. State*, 2012 UT 93, ¶ 18, 293 P.3d 345 (citation and internal quotation marks omitted). "In making this assessment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* (citation and internal quotation marks omitted).

ANALYSIS

I. Newly Discovered Evidence

¶13  Mulder contends that the district court erroneously granted the State's motion for summary judgment on his newly discovered evidence claim. In support of this claim, Mulder submitted two affidavits from Campbell, in which Campbell attested that "Mulder was innocent of all charges" and that Campbell had previously "lied about [Mulder's] involvement." Campbell also attested that he had "trick[ed]" Mulder and Schlegel "into going to Mesquite, . . . under false pretenses." He further claimed that on the day of the murder, he dropped Mulder off at a shopping complex in Mesquite and then "went to St. George and did the armed robbery . . . completely alone."

¶14  Under the PCRA, a petitioner is entitled to relief based on "newly discovered material evidence" if (1) neither the petitioner nor his counsel knew of, or could have discovered through the exercise of reasonable diligence, the evidence before or at the time of trial; (2) the material evidence is not merely cumulative of evidence already known; (3) the material evidence is not merely impeachment evidence; and (4) "viewed with all the other evidence, the newly discovered material evidence demonstrates that no reasonable trier of fact could have found the petitioner guilty of the offense or subject to the sentence received." Utah Code Ann. § 78B-9-104(1)(e) (LexisNexis 2012). "[U]nder the PCRA, as well as our due process case law, newly discovered evidence merits post-conviction relief only if the evidence would create a reasonable doubt as to the defendant's guilt." *Medel v. State*, 2008 UT 32, ¶ 51, 184 P.3d 1226.

¶15  The district court denied Mulder's newly discovered evidence claim, ruling that Mulder's claim failed because Campbell's affidavits, "viewed with all the other evidence, certainly do[] not demonstrate that no reasonable trier of fact

would find [Mulder] guilty." *See* Utah Code Ann. § 78B-9-104(1)(e)(iv). Specifically, the district court noted that Campbell had testified against Mulder at Mulder's trial and that Campbell's affidavits contradicted the trial testimony of both Campbell and Mulder. The court also noted that Campbell's affidavits "would have little credibility because [he] would clearly be admitting that he lied under oath at [Mulder's] first trial." Finally, the court noted that "the prosecution would still have the testimony of [Schlegel] and the physical evidence against [Mulder]."

¶16   To qualify as newly discovered evidence meriting relief, Campbell's affidavits must, when considered with existing evidence, demonstrate that "no reasonable trier of fact could have reached the jury's conclusion." *Taylor v. State*, 2012 UT 5, ¶ 26, 270 P.3d 471; *see also Medel*, 2008 UT 32, ¶ 51. Although Campbell's affidavits are favorable to Mulder, they are not so compelling as to demonstrate that no reasonable trier of fact could have found Mulder guilty. To begin with, Campbell's affidavits conflict with his trial testimony and are therefore wanting in credibility. Among other things, Campbell testified at trial that (1) Mulder gave him a revolver to use during the robbery; (2) Mulder was with him when he bought bullets for the gun and they decided together that "bullets had to go in the gun" to make it threatening; (3) Mulder helped him obtain a disguise; (4) Mulder accompanied him to St. George on the day of the crime; and (5) Mulder dropped him off near Victim's shop and then picked him up from Victim's shop after the shooting and robbery. The discrepancies between Campbell's trial testimony and his subsequent affidavits, *see supra* ¶ 13, bring his credibility as a witness into question.

¶17   Moreover, Campbell's affidavits conflict with other evidence implicating Mulder, including Mulder's own trial testimony. For example, Mulder testified that he and Campbell bought a wig, beard, and stun gun together and that he

participated in the crime under a threat of blackmail from Schlegel. Likewise, Campbell's affidavits conflict with Schlegel's trial testimony. Schlegel testified that Mulder was an active, voluntary participant in the planning and execution of the crime. She further testified that Mulder and Campbell obtained duct tape, a stun gun, and Campbell's disguise; that she and Mulder saw Campbell wearing his disguise on the morning of the crime; that Mulder and Campbell left the hotel together on the morning of the crime; that when Mulder and Campbell returned to the hotel, they were carrying two big bags of coins; and that several days after the robbery, Mulder tried to pawn one of the stolen gold coins at a Las Vegas pawn shop. And Mulder's trial testimony corroborated several portions of Schlegel's testimony: Mulder testified that he and Campbell bought Campbell's disguise and a stun gun together, that he saw Campbell wearing his disguise on the morning of the crime, that he left the hotel with Campbell on the morning of the crime, and that he tried to pawn one of the stolen gold coins shortly after the robbery.

¶18 In light of the foregoing, a reasonable jury could choose to disregard Campbell's affidavits and convict Mulder based on the other evidence presented at trial. Consequently, Mulder has not demonstrated that Campbell's affidavits—when "viewed with all the other evidence"—are such that "no reasonable trier of fact could have found [him] guilty." *See* Utah Code Ann. § 78B-9-104(1)(e)(iv). We therefore conclude that the district court did not err in granting the State's motion for summary judgment on Mulder's newly discovered evidence claim.[2]

---

2. Mulder also argues that under *Julian v. State*, 2002 UT 61, 52 P.3d 1168, a newly discovered evidence claim does not automatically fail when one witness recants but one or more other witnesses do not, *see id.* ¶ 21 ("Under our case law . . . the fact that one or more witnesses have not recanted does not automatically mean that there is not a substantial likelihood of a
(continued…)

## II. Ineffective Assistance of Appellate Counsel

¶19 Mulder contends that the district court erroneously granted the State's motion for summary judgment because appellate counsel rendered constitutionally ineffective assistance. Specifically, Mulder argues that on direct appeal, appellate counsel should have raised claims that trial counsel had been ineffective for (1) failing to request a cautionary jury instruction, (2) failing to argue that the prosecutor knowingly presented false testimony from Schlegel, (3) failing to question the prospective jurors about religion and failing to argue that

---

(…continued)

different result on retrial."). However, *Julian* analyzed this question under the standard that existed "under the post-conviction relief case law in effect prior to the enactment of the PCRA." *See id.* ¶ 13. Under that standard, a petitioner was entitled to relief if there was a "substantial likelihood of a different result on retrial." *Id.* ¶ 21; *see also id.* ¶ 17 (acknowledging that "our pre-PCRA case law requires that newly discovered evidence demonstrate more than merely rendering a different result probable at retrial, but less than [ensuring] that no reasonable trier of fact could have found the petitioner guilty of the offense"). Under the current PCRA standard, however, a petitioner can obtain relief only if "the newly discovered material evidence demonstrates *that no reasonable trier of fact could have found the petitioner guilty* of the offense or subject to the sentence received." Utah Code Ann. § 78B-9-104(1)(e)(iv) (LexisNexis 2012) (emphasis added). Because we have determined that Campbell's affidavits, when considered with other existing evidence, including Mulder's and Schlegel's trial testimony, do not demonstrate that "no reasonable trier of fact could have reached the jury's conclusion," *see Taylor v. State*, 2012 UT 5, ¶ 26, 270 P.3d 471, we are not persuaded by Mulder's *Julian* argument.

there was an unconstitutional exclusion of non-LDS individuals from the jury, (4) failing to move to strike four jurors for cause, and (5) failing to subpoena potential alibi witnesses. Mulder also asserts that appellate counsel was ineffective for not arguing that the trial court should have appointed substitute trial counsel.

¶20    "The Due Process Clause of the Fourteenth Amendment [to the United States Constitution] guarantees the right to effective assistance of appellate counsel." *Bruner v. Carver*, 920 P.2d 1153, 1157 (Utah 1996) (citing *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)). "The standard for evaluating whether appellate counsel is ineffective is the same *Strickland* standard used to determine whether trial counsel is ineffective." *Kell v. State*, 2008 UT 62, ¶ 42, 194 P.3d 913; *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) (observing that "the proper standard for evaluating [petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*"). To succeed on a claim of ineffective assistance of counsel, a petitioner must prove that counsel's "representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Moreover, "[f]or a petitioner to prove that [appellate] counsel was ineffective for omitting a claim, he must show that the issue [was] obvious from the trial record and . . . probably would have resulted in reversal on appeal." *Lafferty v. State*, 2007 UT 73, ¶ 39, 175 P.3d 530 (omission and third alteration in original) (citation and internal quotation marks omitted). "To determine whether appellate counsel missed an obvious claim on appeal, we examine the merits of the omitted issues." *Taylor v. State*, 2007 UT 12, ¶ 17, 156 P.3d 739 (brackets, citation, and internal quotation marks omitted); *see also id.* ("Failure to raise an issue that is without merit does not constitute constitutionally ineffective assistance of counsel . . . ." (citation and internal quotation marks omitted)). "Finally, when making a claim under the PCRA, the petitioner bears the burden of establishing

ineffective assistance of appellate counsel." *Ross v. State*, 2012 UT 93, ¶ 24, 293 P.3d 345.

A.     Cautionary Jury Instruction

¶21     Mulder contends that appellate counsel was ineffective for failing to argue on direct appeal that trial counsel was ineffective for not requesting a cautionary jury instruction regarding the testimony of his accomplices—Schlegel and Campbell. The district court denied this claim, concluding that Mulder failed to show that the trial court was required to give a cautionary jury instruction. The court also concluded that Mulder failed to demonstrate prejudice because "the trial court did instruct the jury as to the credibility of witnesses generally" and "the questioning of [Mulder's] accomplices by his trial counsel fully identified for the jury the issues as to the credibility, motives, and potential biases of those accomplices."

¶22     Pursuant to section 77-17-7 of the Utah Code, "[a] conviction may be had on the uncorroborated testimony of an accomplice." Utah Code Ann. § 77-17-7(1) (LexisNexis 2012). "In the discretion of the court, an instruction to the jury *may be given* to the effect that such uncorroborated testimony should be viewed with caution, and such an instruction *shall be given* if the trial judge finds the testimony of the accomplice to be self contradictory, uncertain or improbable." *Id.* § 77-17-7(2) (emphases added).

¶23     In this case, there was testimony from two accomplices—Campbell and Schlegel—and each accomplice's testimony corroborated the other's. Both Campbell and Schlegel testified that Mulder was an active and voluntary participant in the planning and execution of the crime, that Mulder helped Campbell obtain his disguise, that Mulder and Schlegel saw Campbell wearing his disguise on the morning of the crime, that Mulder and Campbell left the hotel together on the morning of

the crime, that Mulder and Campbell returned to the hotel with stolen coins, and that Mulder tried to pawn a stolen gold coin a few days after the crime. In addition, Mulder's own testimony corroborated much of Schlegel's and Campbell's testimony, *see supra* ¶ 17, and the State introduced corroborating physical evidence, such as a receipt demonstrating that Mulder had sold a gold coin shortly after the crime. Consequently, because the testimony of Schlegel and Campbell was corroborated, section 77-17-7 did not apply, and the decision of whether to give a cautionary instruction rested with the trial court. *See State v. Guzman*, 2004 UT App 211, ¶ 36, 95 P.3d 302 (observing that "in the case of corroborated accomplice testimony, giving [a cautionary] instruction is discretionary"). Thus, even if trial counsel had requested a cautionary instruction, the trial court could have exercised its discretion and denied such a request. We therefore conclude that Mulder has not demonstrated that appellate counsel performed deficiently by failing to raise a claim that trial counsel was ineffective for not requesting a cautionary jury instruction.

¶24 Moreover, Mulder has not shown that he was prejudiced by appellate counsel's performance, because he has not shown that raising this claim "probably would have resulted in reversal on appeal." *Lafferty*, 2007 UT 73, ¶ 39 (citation and internal quotation marks omitted). Here, the jury was instructed generally about its obligations in judging the credibility of the witnesses and the weight of the evidence. *See Guzman*, 2004 UT App 211, ¶ 37 (observing that Utah courts have "held that it is not error to refuse a proposed instruction if the point is properly covered in other instructions" (citation and internal quotation marks omitted)). Specifically, the trial court instructed the jury to consider any witness's "possible bias or possible interest in the result of the trial, and any possible motive the witness may have to testify in a particular way." The court also instructed the jury to consider whether any witness's testimony was "self-contradicting testimony or was contradicted by other evidence."

¶25 Furthermore, trial counsel repeatedly highlighted the self-interest of both Schlegel and Campbell at trial. Trial counsel elicited testimony that Schlegel had received full immunity for her testimony and that Campbell was testifying pursuant to a plea bargain he had negotiated with the State. Trial counsel also called one of Campbell's fellow inmates, who testified that Campbell had told him that he was testifying pursuant to a plea deal, as well as an expert witness on prison culture, who testified that it would have been unlikely for Campbell to have testified without a plea deal. Based on the foregoing, a cautionary instruction "was simply not necessary to prompt the jury to question [the] veracity" of Schlegel and Campbell because the trial court's general instructions and the testimony that trial counsel elicited adequately "alerted the jury to [their] possible motive[s] for testifying with less than total candor." *See Guzman*, 2004 UT App 211, ¶ 37. Because the record demonstrates that a cautionary instruction likely would not have affected the jury's ultimate conclusion, we conclude that the district court did not err in determining that appellate counsel was not ineffective for omitting this claim on direct appeal.

B.     Prosecutorial Misconduct

¶26 Mulder next contends that appellate counsel was ineffective when she failed to argue on direct appeal that trial counsel was ineffective for not arguing that the prosecutor knowingly presented false testimony from Schlegel. The district court concluded that Mulder's "claims of prosecutorial misconduct are not shown to be factually or legally correct" and that appellate counsel was therefore not ineffective for omitting this claim on direct appeal.

¶27 Schlegel testified at the preliminary hearing that she had never seen Mulder with a gun. Then at trial, Schlegel testified that during the planning of the robbery, she did not recall ever seeing a gun of any sort, "just the stun gun." Upon further

questioning, Schlegel again testified that when the crime "was being talked about . . . before it happened," "[t]he only gun I knew about was the stun gun at the time." She also recalled that after the crime, a gun "showed up" in her and Mulder's home in Las Vegas, that Mulder "had the gun" when she first saw it, and that she helped Mulder sell a gun several weeks after the crime. According to Mulder, the evidence in this case proves that the weapon used in the crime was a ".32 caliber," but Schlegel described the gun as being over twelve inches long and as a "'Dirty Harry' type gun."[3] Mulder asserts that "[a]ny criminal prosecutor should know with absolute certainty that a .32 caliber revolver could not in any way be misconstrued as a 'Dirty Harry' gun. This fact alone shows that Schlegel was perjuring herself." Thus, Mulder contends, appellate counsel should have argued on direct appeal that trial counsel was ineffective for not arguing that the prosecutor committed misconduct by knowingly presenting false testimony from Schlegel.

¶28    "As the State's representative, the prosecutor has a duty to 'see that justice is done.'" *State v. Gordon*, 886 P.2d 112, 115 (Utah Ct. App. 1994) (quoting *Walker v. State*, 624 P.2d 687, 691 (Utah 1981)). "[W]hen a prosecutor is aware that testimony is false, he or she has a duty to correct the false impression; failure to do so requires reversal 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* at 116 (quoting *Walker*, 624 P.2d at 690).

¶29    To prevail on a prosecutorial misconduct claim, appellate counsel would have been required to demonstrate that the prosecutor was aware that Schlegel's testimony was false, *see id.*, and that he presented it anyway. However, nothing in the record

---

3. To be exact, Schlegel testified that the gun was "long" and that it "looked like the one that . . . Clint Eastwood would have. It was a big gun."

proves that Schlegel's trial testimony—that she saw Mulder with a gun several weeks after the crime—was actually false. Indeed, Schlegel's testimony that she saw Mulder with a gun several weeks *after* the crime does not conflict with her testimony that she only saw Mulder with a stun gun before and around the time of the crime. But more importantly, even if Schlegel did testify falsely, nothing in the record suggests that the prosecutor knew or believed Schlegel's trial testimony to be false and knowingly presented her testimony anyway. *See id.*; *see also Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."). Consequently, this claim would not have been "obvious from the trial record" and appellate counsel had no obligation to raise it on direct appeal. *See Lafferty v. State*, 2007 UT 73, ¶ 39, 175 P.3d 530 (citation and internal quotation marks omitted).

¶30　In addition, Mulder has not shown that raising the claim "probably would have resulted in reversal on appeal." *Id.* (citation and internal quotation marks omitted). To prevail on direct appeal, appellate counsel would have been required to prove that "there is [a] reasonable likelihood that the false testimony could have affected the judgment of the jury." *See State v. Schreuder*, 726 P.2d 1215, 1228 (Utah 1986) (citation and internal quotation marks omitted). In this case, apart from Schlegel's testimony, Campbell testified that Mulder had a gun and that he gave it to Campbell and encouraged him to use it during the crime. Moreover, putting any testimony about the gun aside, there was an array of testimony from both Schlegel and Campbell demonstrating that Mulder was actively involved in the planning and execution of the crime. *See supra* ¶¶ 16–17. Accordingly, there is no reasonable likelihood that the jury would have acquitted Mulder if it had not heard Schlegel's testimony that she saw Mulder with a gun several weeks after the crime, and Mulder has not demonstrated that he was

prejudiced by appellate counsel's decision to omit this claim on direct appeal. Therefore, the district court did not err in determining that appellate counsel was not ineffective for omitting this claim on direct appeal.

## C.     Religion

¶31    Mulder next contends that appellate counsel should have raised a claim that trial counsel was ineffective for (1) not questioning the prospective jurors about religion and (2) not arguing that there was an unconstitutional exclusion of non-LDS individuals from the jury. The district court concluded that appellate counsel was not ineffective for omitting these claims on direct appeal because (1) "trial strategy is discretionary, and failure to make religion an issue is not per se ineffective assistance of counsel"; (2) "the Utah Constitution prohibits finding a juror incompetent 'on account of religious belief or the absence thereof'" and "[i]nquiry into religious belief is permissible only where religion is 'clearly relevant' to the case"; and (3) "there is no evidence of any unconstitutional exclusion of [non-LDS individuals] from the jury."

¶32    Mulder first claims that voir dire questions about prospective jurors' religious affiliation were warranted because, as a "non-LDS member," he was "part of a distinct minority group in Washington County" whose "lifestyle conflict[ed] with LDS doctrine." Mulder also contends that LDS jurors would have been biased against him because Victim was an LDS bishop.

¶33    The Utah Constitution guarantees that no person "shall . . . be incompetent as a witness or juror on account of religious belief or the absence thereof." Utah Const. art. I, § 4; *see also* Utah Code Ann. § 78B-1-103(2) (LexisNexis 2012) ("A qualified citizen may not be excluded from jury service on account of . . . religion . . . ."). However, "juror competence and

juror bias are separate considerations." *State v. Flores*, 2015 UT App 88, ¶ 14, 348 P.3d 361. Thus, "while it is ordinarily inappropriate to inquire into venire members' religious beliefs during voir dire, inquiries into religion may be appropriate when the case presents the possibility of actual bias stemming from religious beliefs." *Id.* (citation and internal quotation marks omitted). In other words, "inquiry into potential jurors' religious affiliation . . . may occasionally be permissible during voir dire," but only where religion is "clearly relevant." *State v. Burke*, 2011 UT App 168, ¶ 74, 256 P.3d 1102; *see also, e.g., Depew v. Sullivan*, 2003 UT App 152, ¶ 23, 71 P.3d 601 (concluding that limited religious inquiry would have been appropriate during voir dire where the defendant was absent from trial because he was serving an LDS mission, especially "considering the heavy emphasis the [LDS Church] places on missionary service"); *Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, 758 P.2d 929, 933 (Utah Ct. App. 1988) ("Whenever a religious organization is a party to the litigation, voir dire regarding the jury panel's religious affiliation is proper.").

¶34 We conclude that Mulder's argument lacks merit for several reasons. First, appellate counsel was not obligated to raise a futile claim about trial counsel's performance during voir dire. "[J]ury selection is more art than science," and there are "a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about prospective jurors." *State v. Litherland*, 2000 UT 76, ¶ 21, 12 P.3d 92. Trial counsel's actions during voir dire are therefore presumed to be matters of trial strategy, and the decision to conduct voir dire on religious affiliation is a choice best left to trial counsel. *See id.* ¶ 25 ("[T]he appellate court will presume that counsel's lack of objection to, or failure to remove, a particular juror was the result of a plausibly justifiable conscious choice or preference."); *see also id.* ¶ 23 ("Defense counsel . . . clearly have the right to identify and prefer particular jurors

without regard to any particular objective criterion or philosophy of jury selection."). Consequently, although Mulder now believes that trial counsel should have thought that members of the LDS Church would be biased against him, his counsel was not required to share that particular sentiment.

¶35    But more importantly, Victim's position as an LDS bishop did not make religion "clearly relevant" to this case. *See Burke*, 2011 UT App 168, ¶ 74. There was no apparent religious motivation for the crime; rather, Mulder and his accomplices appear to have been motivated by financial gain alone. And, as the State correctly observes, Victim was not killed while he was at church or while he was serving in his ecclesiastical capacity; Victim was killed while he was working at his coin shop. Moreover, the only reference in the record to Victim's status as an LDS bishop came during a pretrial hearing when trial counsel mentioned to the court that Victim "was a Mormon bishop and well known in the community." In addition, during voir dire each prospective juror was asked whether they knew Victim, and no one said that they did. Consequently, religious issues played no part in this case, and trial counsel could reasonably choose to forgo asking questions about prospective jurors' religious affiliation.

¶36    Nevertheless, Mulder insists that "it is a foregone conclusion that some or all of the jurors knew of [Victim's] position in the Church" and that "it's common sense that in a small town, people in that town know each other or know of each other." However, as noted above, the prospective jurors stated that they did not know Victim. Thus, Mulder's claim is entirely speculative, and it cannot support a claim of ineffective assistance of counsel. *See State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 ("[P]roof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." (citation and internal quotation marks omitted)).

¶37  Mulder also appears to be arguing that his "lifestyle" made religion relevant because he is not a member of the LDS Church. However, as the State correctly points out, "no Utah decision has held that this, alone, makes religion 'clearly relevant' to any case involving a non-Mormon." Moreover, we agree with the State that opposition to Mulder's "lifestyle" "is not unique to members of any particular church, or even to religious people at all. Atheists and agnostics would likely have similar objections, because crime threatens all law-abiding citizens alike. Obeying the law is a civic virtue, not a religious one . . . ." Because religion was not clearly relevant to this case, appellate counsel had no basis for arguing that trial counsel was ineffective for not asking prospective jurors about their religious affiliation. It follows that Mulder was not prejudiced by appellate counsel's decision not to raise this claim on appeal.

¶38  Mulder's second argument is that appellate counsel should have argued there was an unconstitutional exclusion of non-LDS individuals from the jury. The district court rejected this argument, concluding that "there is no evidence of any unconstitutional exclusion of non-Mormons from the jury." We agree with the district court.

¶39  In his brief, Mulder recognizes that prospective jurors were not asked about their religious affiliation because "the jury questionnaire used in [his] voir dire is [purposefully] devoid of any questions that could elicit religious based bias." Because prospective jurors were not asked in their jury questionnaires about their religious affiliation, it follows that neither trial counsel nor the trial court could have known who was (or was not) a member of the LDS Church.[4] Accordingly, it would not

---

4. We note that one juror who sat on the jury mentioned her "church ward" during voir dire. But upon further questioning by trial counsel, which only occurred because the juror

(continued…)

have been "obvious from the trial record" that there was an exclusion of non-LDS individuals from the jury, and thus, Mulder cannot demonstrate that appellate counsel was ineffective for omitting this claim on direct appeal. *See Lafferty v. State*, 2007 UT 73, ¶ 39, 175 P.3d 530 (citation and internal quotation marks omitted). We therefore conclude that the district court did not err in determining that appellate counsel was not ineffective for omitting these issues on direct appeal.

D.    Individual Jurors

¶40    Mulder next contends that appellate counsel was ineffective for not challenging trial counsel's ineffectiveness in failing to move to strike four jurors for cause. In his PCRA petition, Mulder argued that appellate counsel should have challenged trial counsel's decision to pass eleven jurors for cause. The district court rejected each of these arguments, concluding that Mulder's accusations "do not rise above the level of 'conspiracy theories,' speculation and reckless besmirching of individuals and an entire community," and that appellate counsel was not ineffective for omitting these issues on direct appeal. The court further noted that "[t]he record shows that trial counsel actively questioned prospective jurors during voir dire" and that Mulder "fails to show that any juror was actually and impermissibly biased." Mulder now challenges the district court's ruling with respect to four of the challenged jurors—L.D., K.G., S.H., and S.D.

¶41    In an ineffective assistance of counsel context, "[t]o show that appellate counsel missed an obvious claim by not

---

(…continued)

mentioned her religion, the juror confirmed that she "wouldn't let [her] church affiliation background in any way interfere with [her] decision making process."

challenging his trial counsel's performance during jury selection, [a defendant] must prove that trial counsel's performance fell below an objective standard of reasonable judgment and that counsel's deficient performance was prejudicial." *Taylor v. State*, 2007 UT 12, ¶ 73, 156 P.3d 739. Proving that his counsel's performance fell below an objective standard of reasonableness requires Mulder to "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted). "In the context of jury selection, this is a difficult task because a defendant must not only overcome the presumption that trial counsel made a conscious choice to keep the juror but also overcome the presumption that trial counsel's decision to keep a juror constituted effective assistance of counsel." *Id.* (citation and internal quotation marks omitted). Furthermore, to establish prejudice, Mulder "'must show that his counsel's actions . . . allowed the seating of an actually biased juror.'" *State v. Arriaga*, 2012 UT App 295, ¶ 13, 288 P.3d 588 (omission in original) (quoting *State v. King*, 2008 UT 54, ¶ 18, 190 P.3d 1283); *see also id.* (observing that a defendant "has the burden to show that the deficient performance 'affected the outcome of the case'" (quoting *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92)).

¶42 The Utah Supreme Court has recognized that evaluating trial counsel's jury selection decisions is "an inherently speculative exercise" due, in part, to the fact that "a trial attorney's decisions . . . may be based on little more than personal preference." *Taylor*, 2007 UT 12, ¶ 74 (omission in original) (citations and internal quotation marks omitted). "While trial counsel's decisions are presumed to be reasonable, the presumption is not irrebuttable." *Id.* ¶ 75. A defendant may rebut the presumption that trial counsel's decision not to remove a particular juror was the result of a plausibly justifiable conscious choice or preference by showing

(1) that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that defense counsel's choice was not plausibly justifiable.

*Id.* (citation and internal quotation marks omitted). Mulder claims that trial counsel was ineffective for failing to remove the aforementioned jurors because they expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove them.

1.     Mulder has not carried his burden with respect to L.D.

¶43    Mulder argues that L.D. should have been removed because (1) she had previously worked as a prison nurse; (2) "she had once been the victim of a similar crime"; (3) she made a statement "regarding her husband who was once a N.Y. police officer"; and (4) a statement in her jury questionnaire suggested that she found police officers to be "[m]ore credible." We address these arguments in turn.

¶44    First, Mulder argues that L.D. should have been removed for cause because she stated in her jury questionnaire that she had previously worked as a nurse at a maximum security prison. Mulder relies on a Colorado case, *People v. Scott*, 583 P.2d 939 (Colo. App. 1978), for the proposition that personnel of a penitentiary constitute law enforcement such that they "shall be excused from jury service." *Id.* at 941–42. *But see id.* at 942 (observing that *former* employees of public law enforcement

agencies do not appear to be disqualified from jury service). According to Mulder, L.D.'s "function as a nurse rather than a full-blown corrections officer does not dissuade the rule of common law that she be excused for cause from jury service."

¶45     However, Utah courts have "upheld denials of motions to strike law enforcement personnel for cause when questioning on voir dire dispels any suggestion of bias raised by the prospective juror's law enforcement background." *State v. Ramos*, 882 P.2d 149, 152 (Utah Ct. App. 1994); *see also Coggeshell v. State*, 2011 UT App 375, ¶ 6, 265 P.3d 818 (per curiam) (observing that "law enforcement personnel are not automatically disqualified from jury duty in a criminal case"). For example, in *State v. Ramos*, this court concluded that the trial court's questioning dispelled any inference that a juror who had worked as a police dispatcher for twenty years was biased. 882 P.2d at 153–54. In *State v. Gray*, 851 P.2d 1217 (Utah Ct. App. 1993), this court similarly concluded that the trial court's careful voir dire of a juror who had worked as a highway patrolman for four years rebutted any inference of bias. *Id.* at 1222–23. And in *State v. Cobb*, 774 P.2d 1123 (Utah 1989), our supreme court concluded that the trial court's questioning of a juror who had worked as a police officer for two years "cleared up any doubts regarding [the juror's] ability to be an impartial juror." *Id.* at 1127–28.

¶46     In this case, both the prosecutor and trial counsel initially agreed that L.D. should be stricken for cause due to her previous employment as a prison nurse; however, after extensive questioning of L.D. in chambers, both the prosecutor and trial counsel passed L.D. for cause. During voir dire, L.D. explained that she had worked as a prison nurse for six years at a maximum security prison in New York. She then stated numerous times that this experience would not affect her opinion when evaluating this case. Specifically, L.D. explained: "I think that every person has a right to [be] heard [regarding] all sides of whatever crime has been committed, and then a

judgment made from that." She further explained that during her time as a prison nurse she had "tried not to become personal and . . . make personal opinions . . . on some of these inmates that came into our unit." After L.D. left the trial court's chambers, trial counsel stated that after observing L.D. and hearing her answers to the questions regarding her background, he believed that she had answered the questions with candor and that she had "an open mind." The trial court agreed, stating that L.D. appeared "to be quite a professional" and seemed "very even handed." Consequently, even if L.D.'s former position as a prison nurse could be seen as facially raising an issue of impartiality, the subsequent questioning of L.D. "cleared up any doubts" regarding her ability to serve as an impartial juror. *See Cobb*, 774 P.2d at 1127–28.

¶47 Second, Mulder argues that L.D. should have been removed for cause because "she had once been the victim of a similar crime." "A potential juror's prior victimization does not mandate the juror be removed for cause." *State v. Boyatt*, 854 P.2d 550, 553 (Utah Ct. App. 1993); *see also State v. Tennyson*, 850 P.2d 461, 469 (Utah Ct. App. 1993) ("We are unaware of . . . any rule that automatically disqualifies prospective jurors who have been, or have friends or relatives who have been, victims of crimes similar to those at issue in the case where they might sit as jurors."). Rather, in *State v. Brooks*, 868 P.2d 818 (Utah Ct. App. 1994), *overruled on other grounds*, 908 P.2d 856 (Utah 1995), this court acknowledged that a question of *potential* bias arises when a prospective juror indicates that he or she has been the victim of a similar crime, *id.* at 823. Thus, in such circumstances, "the court or counsel must investigate further to determine if the juror can be impartial despite the past experience." *State v. Wach*, 2001 UT 35, ¶ 29, 24 P.3d 948. "If, after probing the prospective juror's state of mind, the trial court is satisfied that the juror can view and weigh the evidence impartially, the inquiry is at an end." *Brooks*, 868 P.2d at 823.

¶48   In this case, L.D. was questioned in chambers about her prior victimization, and she explained that she had been burglarized eighteen to twenty years earlier in Nevada. She stated that she felt "a little violated when that happened" and that it "took a little while to get over that." Trial counsel then asked L.D. if the fact that Mulder had been previously convicted of burglary would impact her ability "to weigh fairly and give [Mulder] every presumption that the law does in fact give him." L.D. explained that she had a brother who served time in prison for burglary, that she loved her brother, and that she would have to "know [the] circumstances" before judging someone who allegedly committed such a crime. Ultimately, L.D. stated that she thought she "could be fair." Accordingly, L.D.'s responses related to her prior victimization indicated that she could be impartial despite having been the victim of a similar crime. *See Wach*, 2001 UT 35, ¶ 29.

¶49   Third, Mulder argues that L.D. should have been removed for cause because she made a statement "regarding her husband who was once a N.Y. police officer." During voir dire, trial counsel asked L.D. whether her deceased husband had been involved in law enforcement. L.D. explained that her husband had been a traffic patrol officer in New York and that he had left the job twenty-five to thirty years earlier. When trial counsel remarked that L.D.'s husband had been a "smoky bear on the turnpike," L.D. replied, "Yeah. One of New York's finest." Based on this brief exchange, Mulder asserts that trial counsel should have moved to strike L.D. for cause, because "[r]eferring to a police officer as one of the finest citizens of a state is indicia of strong bias." However, the trial court confirmed with L.D. that "there was nothing about being married to [her husband]" that would impact her ability to be impartial. Consequently, L.D.'s isolated comment regarding her husband did not "indicate[] the sort of strong or unequivocal bias that would mandate [her] removal from the jury." *See State v. Litherland*, 2000 UT 76, ¶ 28, 12 P.3d 92.

¶50 Fourth, Mulder argues that L.D. should have been removed for cause because she made a statement in her jury questionnaire that suggested she found police officers to be "[m]ore credible." In the written jury questionnaire, jurors were asked: "Do you agree/disagree with the following statement: 'A police officer's testimony in court should receive more or less weight, be given more or less credibility, than the testimony of a non-police officer.'" In response, L.D. wrote, "More credible— He holds a position of authority, should be honest." Mulder contends that this response indicates that L.D. was actually biased, and because she was "never asked about this expressed bias," the trial court "could not possibly have been satisfied that [L.D.'s] bias had in any way been attenuated."

¶51 In her written questionnaire, L.D. stated, "I would be a good juror because I would not make a decision until I have heard all the facts." And she stated that she understood that "[o]ne of the basic principles of American law is that a person cannot be convicted unless the prosecution proves the charges beyond a reasonable doubt," and that Mulder "is not considered guilty as he sits here and [she] need not hear anything to find him not guilty." During voir dire, L.D.'s individual questioning and counsel's on-the-record discussion of L.D. were extensive, spanning twenty-three pages of transcript. During her individual questioning, L.D. stated that due to her experience as a prison nurse, she strongly believed that "every person has a right to [be] heard [regarding] all sides of whatever crime has been committed, and then a judgment made from that." She also stated that she thought she "could be fair." Upon further questioning by the trial court, L.D. stated that she agreed with the presumption of innocence and that Mulder's convictions in other states and his involvement with illegal drugs would not affect her ability to be impartial. Thus, although L.D. was not specifically asked about the "more credible" statement from her jury questionnaire, other responses from her questionnaire along with counsel's and the trial court's subsequent questioning

"cleared up any doubts" regarding her ability to be an impartial juror. *See State v. Cobb*, 774 P.2d 1123, 1127–28 (Utah 1989).

¶52     Moreover, although a police officer did testify at trial, the record indicates that his testimony was largely related to how the investigation of the case unfolded. Thus, it appears as though the officer's credibility "was not really at issue," and Mulder has not claimed that the officer misrepresented anything during his testimony. *See State v. Arriaga*, 2012 UT App 295, ¶ 16, 288 P.3d 588 (observing that it was "difficult to see any possibility of prejudice" to the defendant where the police officer's credibility "was not really at issue" and there was no claim that the officer misrepresented or tampered with the contents of a recorded interview). Consequently, Mulder has not demonstrated that L.D.'s statement regarding police officers' credibility prejudiced him.

¶53     In sum, Mulder has not demonstrated that there was no plausible basis for trial counsel's decision not to challenge L.D. during the jury selection process. The record demonstrates that L.D. was thoroughly vetted during voir dire, during which she reaffirmed her ability to judge fairly, and that she did not express a "bias so strong or unequivocal" that she should have been stricken. *See Taylor v. State*, 2007 UT 12, ¶ 75, 156 P.3d 739 (citation and internal quotation marks omitted).[5]

---

5. In passing, Mulder also contends that trial counsel was "so inattentive or indifferent during the jury selection process that the failure to remove [L.D.] was not the product of a conscious choice or preference." *See Taylor v. State*, 2007 UT 12, ¶ 75, 156 P.3d 739. However, the record demonstrates that trial counsel was actively engaged throughout the voir dire process. Trial counsel submitted a twelve-page jury questionnaire to all prospective jurors before trial and actively participated in questioning the prospective jurors throughout the two days of

(continued…)

2. Mulder has not carried his burden with respect to K.G.

¶54 Mulder argues that K.G. should have been removed because (1) he was an LDS bishop and (2) he was once a military police officer and had relatives in law enforcement. Mulder also contends that he is entitled to relief because the transcript of K.G.'s individual voir dire is "inexplicably incomplete."

¶55 First, Mulder claims that K.G. should have been removed for cause because of "potential prejudicial bias resulting from his . . . position as [an] LDS bishop." However, in the ineffective assistance of counsel context, to establish prejudice, Mulder "must show that his counsel's actions . . . allowed the seating of an *actually* biased juror." *Arriaga*, 2012 UT App 295, ¶ 13 (omission in original) (emphasis added) (citation and internal quotation marks omitted). Here, Mulder has not cited anything in the record demonstrating that K.G. was actually biased because he was an LDS bishop; rather, his claim is based only on pure speculation. *See State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (observing that "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality" (citation and internal quotation marks omitted)). Moreover, as previously discussed, religion was not clearly relevant to this case, and therefore inquiry into K.G.'s religious beliefs and his ecclesiastical position during voir dire would have been inappropriate. *See supra* ¶ 35; *Hornsby v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints*, 758 P.2d 929, 933 n.2 (Utah Ct. App. 1988) (stating that "[t]he religious beliefs of the prospective jurors are not directly related

_____

(…continued)

voir dire. The record also indicates that trial counsel paid specific attention to L.D. based on her jury questionnaire. This participation belies Mulder's claim that trial counsel was inattentive or indifferent during L.D.'s voir dire.

to the subject matter of this suit, and hence could not properly be examined during voir dire").

¶56   Second, Mulder claims that K.G. was biased because of his alleged prior service as a military police officer and because K.G. allegedly had family members serving as police officers. However, in his jury questionnaire, K.G. stated that he had not served in the military or "in the military police or shore patrol" and that he had never been a law enforcement officer. Additionally, the jury questionnaire asked: "Have you, or anyone close to you, ever been employed or sought employment or volunteered to help, any of the following local, state or federal law enforcement or other investigative agency?" The questionnaire then listed twenty-seven different law enforcement departments and governmental agencies. K.G. did not list himself or anyone else under this question. And in any event, as previously discussed, even if K.G. had formerly served in law enforcement, a potential juror's prior law enforcement service does not automatically disqualify him from jury service. *See State v. Ramos*, 882 P.2d 149, 153–54 (Utah Ct. App. 1994). Similarly, the fact that K.G. allegedly had family members in law enforcement does not automatically establish actual bias such that he should have been disqualified from jury service, and Mulder has not demonstrated that K.G.'s relation to law enforcement officers, if true, had any bearing on K.G.'s ability to be fair and impartial. *See State v. Wach*, 2001 UT 35, ¶ 41, 24 P.3d 948 (rejecting a bias claim that was based on one of the jurors being related to a police officer).

¶57   In addition, regardless of K.G.'s ecclesiastical position and alleged law enforcement ties, in his jury questionnaire, K.G. indicated that he could be an impartial juror. K.G. stated that it was more important to him "that the innocent be acquitted" than "the guilty . . . be convicted." He also stated that he understood the presumption of innocence and that Mulder "is considered not guilty as he sits here and [K.G.] need not hear anything to

find him not guilty." K.G. further expressed a willingness to "completely set aside" any prior opinions on the case and "render [his] decision only based on the evidence presented at trial." Consequently, it is difficult to see any evidence of partiality on K.G.'s part. We therefore conclude that Mulder has not demonstrated that K.G. "expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove [him]." *See State v. Litherland*, 2000 UT 76, ¶ 25, 12 P.3d 92.

¶58 Finally, Mulder contends that he is entitled to relief under *State v. Taylor*, 664 P.2d 439 (Utah 1983), because the transcript of K.G.'s individual voir dire is "inexplicably incomplete." Mulder correctly observes that the transcript of K.G.'s voir dire "stops in mid-sentence on pg. 160, line 16 and picks up again at line 18."[6] The State concedes that the transcript of K.G.'s voir dire is incomplete; however, the State contends that *State v. Taylor* does not require reversal in this case.

¶59 In *State v. Taylor*, the defendant argued that the trial court's questioning of potential jurors "was inadequate both for a determination of actual bias as a basis for dismissals for cause and for the intelligent exercise of peremptory challenges." 664 P.2d at 445. The defendant further asserted that because there were many responses of potential jurors that were recorded merely as "inaudible," it was impossible for the appellate court to adequately review his claims of error. *Id.* at 445–46. More specifically, the defendant contended that the trial court erred in rejecting the defendant's challenge to a particular juror for cause. *Id.* That juror then served on the panel and was appointed as jury foreperson. *Id.* However, the juror's answers to two sets of pertinent questions could not be discerned from the transcript.

---

6. It is unclear as to how much of K.G.'s voir dire is missing due to the gap in the transcript.

*Id.* at 445–47. The Utah Supreme Court held that because the transcript did not adequately record the prospective juror's answers, it could not review the appellant's specific claims about that juror. *Id.* at 447. The court observed that when faced with claims of juror bias, an appellate court cannot assume answers that "are totally absent from the record and cannot be reconstructed by agreement of the parties." *Id.* Thus, because the omissions in the transcript rendered the record inadequate for appeal, the court ordered a new trial. *Id.*

¶60 This case is distinguishable. *State v. Taylor* involved a preserved claim raised on direct appeal, whereas Mulder's claim arises in the context of a postconviction challenge to his appellate counsel's performance. Thus, unlike the defendant in *State v. Taylor*, Mulder cannot prevail simply by showing that the trial court erred; rather, he must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *Taylor v. State*, 2007 UT 12, ¶ 73, 156 P.3d 739 (citation and internal quotation marks omitted). And in the context of jury selection, "this is a difficult task because a defendant must not only overcome the presumption that trial counsel made a conscious choice to keep the juror but also overcome the presumption that trial counsel's decision to keep a juror constituted effective assistance of counsel." *Id.* (citation and internal quotation marks omitted). Additionally, Mulder must demonstrate that he was prejudiced by trial counsel's performance. *Id.*; *cf. State v. Menzies*, 845 P.2d 220, 228 (Utah 1992) (reaffirming *State v. Taylor* and observing that "the mere existence of [transcription] errors does not mandate a new trial"; instead, there must be "a showing of prejudice to overturn a conviction on the basis of transcription errors"); *State v. Russell*, 917 P.2d 557, 559 (Utah Ct. App. 1996) (observing that *State v. Taylor* "did not hold that a defendant is entitled to a new trial whenever there is a gap in the record"). Here, although the record demonstrates that trial counsel passed K.G. for cause, Mulder nevertheless attempts to rebut the presumption that trial

counsel made a conscious choice to keep K.G. by contending that K.G. "expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove" him. *See Taylor*, 2007 UT 12, ¶ 75 (citation and internal quotation marks omitted). Mulder asserts that the missing portion of K.G.'s voir dire is "especially relevant" because it would "reflect obvious bias" of K.G.

¶61 We will not presume bias on the part of K.G. based solely on a gap in the transcript of his voir dire. *Cf. West Valley City v. Roberts*, 1999 UT App 358, ¶ 11, 993 P.2d 252 ("[W]e do not presume error simply because a record is incomplete or unavailable."). Rule 11 of the Utah Rules of Appellate Procedure provides a mechanism for a party to reconstruct the record, if possible, if anything material "is omitted from the record by error or accident," as Mulder asserts was the case here. Utah R. App. P. 11. Here, Mulder has not established that there is a gap in the actual audio recording of K.G.'s voir dire by, for example, having the recording retranscribed or checked by the transcriber. And even if he had established a gap, Mulder has not attempted to reconstruct the record pursuant to rule 11. Accordingly, Mulder has not demonstrated or even asserted that the record of K.G.'s voir dire cannot be satisfactorily reconstructed.[7] *Cf. State v. Davis*, 2013 UT App 228, ¶ 90, 311 P.3d 538 (observing that "lack of an adequate record constitutes a basis for remand and a new hearing only where . . . the record cannot be satisfactorily reconstructed" (citation and internal quotation marks omitted)). Consequently, we are not persuaded by Mulder's conclusory assertion that he was prejudiced based on the missing portion of

---

7. Mulder does not assert that appellate counsel was ineffective for failing to assure the existence of a complete record, and even if he had, Mulder would still be required to show how counsel's performance was deficient in this regard and that he was prejudiced. *See Carter v. Galetka*, 2001 UT 96, ¶ 56, 44 P.3d 626.

the transcript. *See, e.g.*, *Menzies*, 845 P.2d at 228 (explaining that a defendant's burden to show prejudice is not satisfied by the mere existence of transcription errors).

¶62 Moreover, Mulder has failed to otherwise demonstrate how he was prejudiced by the incomplete transcript of K.G.'s voir dire. To the extent Mulder argues that the transcript would "reflect obvious bias of [K.G.]" based on K.G.'s status as an LDS bishop and his alleged law enforcement ties, these claims are without merit. Again, religion was not clearly relevant to this case, and consequently, inquiry into K.G.'s religious beliefs and his ecclesiastical position was not an appropriate topic for voir dire. *See supra* ¶ 35. Regarding K.G.'s alleged law enforcement ties, we conclude that the record is adequate to allow us to review this claim. As previously discussed, K.G. stated in his jury questionnaire that he had not served in the military or "in the military police or shore patrol" and that he had never been a law enforcement officer. And he did not list anyone, including himself, under the question "Have you, or anyone close to you, ever been employed or sought employment or volunteered to help, any of the following local, state or federal law enforcement or other investigative agency?"

¶63 Mulder also appears to be arguing that *State v. Taylor* requires reversal because "neither the judge [nor] counsel ever asked [K.G.] if he knew [Victim] or his family" and "[a]ll the other potential jurors were asked, but not [K.G.]" Our review of the record confirms that every other juror who sat on the panel was asked whether he or she knew Victim or his family, a fact which Mulder acknowledges. Consequently, it is almost certain that K.G. was asked as well and that any answer given was unobjectionable. *See Menzies*, 845 P.2d at 232. In addition, K.G. stated in his jury questionnaire that he had not "heard anything about this case before." Based on the foregoing, we conclude that Mulder has not demonstrated that he was prejudiced by the

transcription error in K.G.'s voir dire. In the absence of a showing of prejudice, *State v. Taylor* does not require reversal.

3.    Mulder has not carried his burden with respect to S.H.

¶64    Mulder argues that S.H. should have been removed for cause because she was friends with the wife of a judge. However, although S.H. was friends with the wife of a judge, that judge did not preside over Mulder's trial. And Mulder has not cited any authority for the proposition that a prospective juror cannot sit if he or she is friends with the spouse of a judge not presiding over the case at bar. In addition, S.H. was asked whether she had "ever discussed the law in any way with [the judge]," and she responded, "Never." Mulder points to nothing else in the record to demonstrate that S.H. was actually biased against him. Consequently, Mulder cannot show that S.H.'s friendship with a nonpresiding judge's wife created a "bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove" her. *See State v. Litherland*, 2000 UT 76, ¶ 25, 12 P.3d 92.

4.    Mulder has not carried his burden with respect to S.D.

¶65    Mulder argues that S.D. should have been removed for cause because "she tried to secure employment with the police force and has a close friend with the L.A.P.D." However, Mulder provides no legal analysis as to why these facts about S.D., if true, would render her actually biased. Moreover, as previously discussed, Utah courts have often allowed law enforcement officers to serve on juries, *see, e.g.*, *State v. Ramos*, 882 P.2d 149, 153–54 (Utah Ct. App. 1994), and Mulder has pointed us to no authority holding that persons who have applied for law enforcement positions, or who have friends in law enforcement, cannot serve as jurors. Additionally, trial counsel asked S.D. if her association with her law enforcement friend would "give [her] any bias one way or the other in this case," and S.D.

answered, "No." Consequently, Mulder has not demonstrated that S.D. had "bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove" her. *See Litherland*, 2000 UT 76, ¶ 25.

¶66 In sum, because Mulder has not demonstrated that any of the four challenged jurors expressed a "bias or conflict of interest that [was] so strong or unequivocal as to inevitably taint the trial process," he has not overcome the presumption that trial counsel was acting reasonably and his claims fail. *Id.* ¶ 32. Accordingly, we cannot conclude that appellate counsel missed an obvious claim that would have led to a different result on appeal. *See Lafferty v. State*, 2007 UT 73, ¶ 39, 175 P.3d 530. Likewise, we conclude that the district court did not err when it determined that appellate counsel was not ineffective for failing to raise these claims on direct appeal.

E. Additional Alibi Witnesses

¶67 Mulder next contends that appellate counsel should have raised a claim on direct appeal that trial counsel "should have subpoenaed potential alibi witnesses to be examined during trial testimony." In his PCRA petition, Mulder relied on two letters— one from his mother and one from his uncle—allegedly written to his appellate counsel. The letters detail efforts by Mulder's mother and uncle to corroborate Mulder's claim that he was in Mesquite at the time of the robbery and murder. The district court ruled that "[t]he affidavits of the two proposed alibi witnesses are insufficient to establish a valid alibi, because they do not show that [Mulder] could not have been at the crime scene on the day and at the time of the murder. . . . Therefore, it was not ineffective assistance for appellate counsel to fail to raise this issue on appeal."

¶68 A "purported alibi which leaves it possible for the accused to be the guilty person is no alibi at all." *State v. Romero*,

554 P.2d 216, 219 (Utah 1976) (citation and internal quotation marks omitted). In this case, Mulder claimed that he stayed in Mesquite on the morning of the crime and that he did not accompany Campbell to St. George. Mulder's letters provide no proof of this claim.

¶69 Mulder's mother stated in her letter that, after the trial, she had spoken to people at "two of the three places that my brother and I went to, to confirm that [Mulder] was in fact with these people" and that "the people at both places remembered [Mulder] being there and what they talked about." In his letter, Mulder's uncle stated that he had spoken with "potential witnesses," and that "[w]hat we found was hopeful but inconclusive due to the lack of physical proof that too much lapsed time brings." Notably, Mulder's uncle's letter fails to identify the potential alibi witnesses he spoke to, and neither letter says anything about whether the potential alibi witnesses specifically remembered seeing Mulder in their stores on the morning of the crime.

¶70 Consequently, even if true, Mulder's letters do not establish an alibi because it was possible that Mulder visited the stores on a different day or at a different time than when Campbell robbed and shot Victim. Because it is still "possible for the accused to be the guilty person," Mulder's letters created "no alibi at all." *See Romero*, 554 P.2d at 219 (citation and internal quotation marks omitted). Therefore, Mulder has not demonstrated that his appellate counsel omitted a claim that "probably would have resulted in reversal on appeal," *see Lafferty*, 2007 UT 73, ¶ 39 (citation and internal quotation marks omitted), and the district court did not err in determining that appellate counsel was not ineffective for omitting this claim on direct appeal.

F.     Substitute Counsel

¶71    Lastly, Mulder contends that appellate counsel was ineffective for not arguing that the trial court should have appointed substitute counsel because trial counsel allegedly prevented Mulder from "present[ing] his theory of the case." The district court concluded that the "reasons given by [Mulder] for the appointment of substitute counsel did not and do not constitute good cause for such an appointment" and that trial counsel presented Mulder's theory of the case at trial through Mulder's own testimony. The court further observed that trial counsel "presented the only alibi evidence that might have been obtained from the defense investigator" and that trial counsel presented the testimony of one of Campbell's fellow inmates in an effort to impeach Campbell's testimony. Noting that "[n]othing suggested by [Mulder] in this respect shows any likelihood of a different verdict," the district court concluded that appellate counsel was not ineffective for failing to raise this issue on direct appeal.

¶72    "While an indigent defendant has a right to have counsel appointed to represent him, he does not have a constitutional right to a lawyer other than the one appointed, absent good cause." *State v. Pursifell*, 746 P.2d 270, 272 (Utah Ct. App. 1987) (citation omitted). Good cause may be demonstrated by "a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *State v. Lovell*, 1999 UT 40, ¶ 31, 984 P.2d 382 (citation and internal quotation marks omitted); *see also State v. Pando*, 2005 UT App 384, ¶ 27, 122 P.3d 672 ("The burden on a defendant to show good cause is a heavy one."). When a defendant expresses dissatisfaction with counsel, a trial court "must make some reasonable, non-suggestive efforts to determine the nature of the defendant's complaints." *Pursifell*, 746 P.2d at 273.

¶73    In this case, Mulder complained about trial counsel to the trial court on two occasions. Nevertheless, the trial court did not appoint replacement counsel, and there is no indication that the court conducted a *Pursifell* inquiry. The State concedes that the trial court's "[f]ailure to conduct such an investigation is *per se* error." We agree; the trial court erred in not conducting a meaningful inquiry into Mulder's allegations. However, the State argues that the trial court's error was harmless and that Mulder is not entitled to a reversal because the record is "'sufficient to support the trial court's determination that good cause did not exist for substitut[ing] counsel.'" (Quoting *State v. Valencia*, 2001 UT App 159, ¶ 14, 27 P.3d 573.) We agree with the State.

¶74    First, Mulder asserts that trial counsel did not allow him to "present his theory of the case." According to Mulder, "trial counsel instructed [him] that he could only speak in response to the questions that counsel asked, therefore, not allowing [him] to effectively present his version of events which may have made the difference between guilty or not guilty." Mulder's theory of the case was detailed in a February 24, 2006 letter written to trial counsel. In his letter, Mulder alleged that the robbery was Schlegel's idea, that Schlegel had blackmailed Mulder into participating in the crime, that Mulder agreed to rob Victim's shop but that he actually planned to stay in Mesquite and not partake in the robbery, and that Campbell drove to St. George and robbed the shop on his own. When Mulder testified at trial, trial counsel elicited this exact account during direct examination. For example, Mulder testified that Schlegel had mentioned that Victim was "sitting on a gold mine" and that it was her idea to rob Victim's coin shop; that Schlegel blackmailed him into participating in the robbery with comments like, "Well, I hope nobody finds out about those burglaries you were doing"; that he told Schlegel that he and Campbell would do the robbery because he "was afraid that she was going to turn [him] in on the burglaries"; that he helped Campbell obtain a disguise so that

Schlegel "would think that we were actually going to go do the robbery"; that when Mulder and Campbell left the hotel on the morning of the crime, Schlegel "thought we were going to do the robbery, but I knew we weren't going to go do that"; and that Campbell left Mulder in Mesquite, where Mulder spent the morning trying to sell jewelry. Moreover, trial counsel engaged an investigator to verify Mulder's claim that he stayed in Mesquite on the day of the crime. The investigator testified that he was able to verify Mulder's descriptions of the stores he allegedly visited and the people he allegedly spoke to. Thus, the record indicates that Mulder was able to "present his theory of the case."

¶75    Second, Mulder asserts that in an August 2006 letter to the trial court, he explained that trial counsel had "let a witness get away . . . who could testify that [Campbell] perjured himself and that the prosecutor encouraged him to do so." According to Mulder, "trial counsel tried . . . not to bring this witness to the stand." However, the record indicates that trial counsel ultimately called that witness, J.D., to testify at trial and secured his favorable testimony. J.D. testified that Campbell told him that "someone in law enforcement or corrections" "had come up to [Campbell] and . . . told him that if he would testify in this case that . . . they [were] going to give him . . . 10 years off his time served or give him 10 years." J.D. further testified that "the story [he] got" was that Campbell was "going to get something for his testimony in this case." Moreover, as previously discussed, trial counsel elicited testimony from Campbell that he was testifying pursuant to a plea bargain. *See supra* ¶ 25. Consequently, although the trial court erred by not making an inquiry into the reasons for Mulder's dissatisfaction with trial counsel, we conclude that Mulder has not demonstrated that he was prejudiced by appellate counsel's failure to raise this claim on direct appeal, because he has not shown that raising the claim "probably would have resulted in reversal on appeal." *See*

*Lafferty v. State*, 2007 UT 73, ¶ 39, 175 P.3d 530 (citation and internal quotation marks omitted).

CONCLUSION

¶76   We conclude that the district court did not err in granting the State's motion for summary judgment. Mulder failed to demonstrate that no reasonable trier of fact could have found him guilty in light of the evidence underlying his newly discovered evidence claim, or that his appellate counsel was constitutionally ineffective. Accordingly, we affirm.

_____